## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

**RONALD FENICLE**
9526 Many Mile Mews
Columbia, Maryland 21046

     *Plaintiff*

v.

**TOWSON UNIVERSITY**
<u>*Serve:*</u> President Kim Schatzel
     Office of the President
     8000 York Road
     Administration Building
     Room 331
     Towson, MD 21252

<u>*Serve:*</u> Brian E. Frosh, Maryland Attorney General
     Office of the Attorney General
     200 St. Paul Place
     Baltimore, MD 21202

<u>*Serve:*</u> John C. Wobensmith, Secretary of State (SOS)
     Office of the Secretary of State
     16 Francis Street
     Annapolis, MD 21401

and

**LISA ANN PLOWFIELD**
in her individual and official capacity.

and

**DIANA EMANUEL**
in her individual and official capacity.

and

**DAN LEONARD**
in his individual and official capacity.

and

**KIM SCHATZEL**

**Case No. 18-917**

1

in her individual and official capacity.

    *Defendants*

---

## AMENDED COMPLAINT AND JURY DEMAND

COMES NOW PLAINTIFF, Ronald Fenicle, by and through undersigned counsel, and files this Complaint, and sues the Defendants Towson University, Dean Lisa Plowfield, Dr. Emanuel, Mr. Leonard, and Dr. Schatzel, and as cause states:

### NATURE OF ACTION

1.    This is an action by Plaintiff, Ronald Fenicle (hereafter "Mr. Fenicle" or "Plaintiff"), to redress actions taken by Defendants, Towson University, Dean Lisa Plowfield, Dr. Emanuel, Mr. Leonard, and Dr. Schatzel (hereafter "Defendants" collectively and/or individually), based upon discrimination pursuant to the Americans with Disabilities Act, as Amended, 42 USC §12101 including Titles I, II and V; Title VII of the Civil Rights Act of 1964, as amended 42 USC § 2000e; the Rehabilitation Act of 1973, including Section 504, 29 USC § 701; 42 U.S.C. § 1983; and the Maryland State Government Article § 20-601, et. seq. Plaintiff brings this action to correct unlawful employment practices on the basis of disability and retaliation.

### PARTIES

2.    Plaintiff Ronald Fenicle resides at 9526 Many Mile Mews, Columbia Maryland 21046.

3.    Defendant Towson University, maintains an address of 8000 York Road, Towson, Maryland 21252. Towson University is a University System of Maryland Member Institution. Defendant Towson University is being sued for all Counts, except Count VI.

4.      Dr. Lisa Plowfield is the Dean of the College of Health Professions at Towson University. Defendant Plowfield is being sued in her official capacity for all Counts and in her individual capacity only for Count VI.

5.      Dr. Diana Emanuel is the Chairperson of the Department of Audiology, Speech-Language Pathology and Deaf Studies at Towson University. Defendant Emanuel is being sued in her official capacity for all Counts and in her individual capacity only for Count VI.

6.      Dan Leonard is the former Fair Practices Officer/Title IX Coordinator/ADA Coordinator at Towson University. Defendant Leonard is being sued in his official capacity for all Counts and in his individual capacity only for Count VI.

7.      Dr. Kim Schatzel is the President of Towson University. Defendant Schatzel is being sued in her official capacity for all Counts and in her individual capacity only for Count VI.

<strong>JURISDICTION AND VENUE</strong>

8.      Jurisdiction in this case is based upon 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a). Venue in this case is based upon 28 U.S.C. § 1343(a)(3) and 28 U.S.C. § 1391, as a substantial part of the events, omissions or incidents which give rise to this case occurred in Maryland, in this judicial district.

9.      Plaintiff has timely complied with any and all conditions precedent and jurisdictional prerequisites to filing suit.

10.     Plaintiff exhausted any and all administrative remedies, including filing a charge of discrimination with the EEOC before filing suit. The EEOC issued a Notice of Right to Sue, dated on January 2, 2018, and the Notice was received by Plaintiff on or about January 5, 2018.

11.     Defendant Towson University receives and accepts federal funding and financial assistance. Further, upon information and belief, Defendant Towson University also distributes federal assistance.

## FACTS

12.     Plaintiff Ron Fenicle (Mr. Fenicle or Plaintiff Fenicle), has been deaf since birth.

13.     In addition to being deaf, Mr. Fenicle has suffered from vertigo for the last fifteen (15) years; a medical impairment that was diagnosed by a doctor.

14.     The vertigo impacts Mr. Fenicle when he wakes up in the morning, getting up after sitting too long, while signing American Sign Language (ASL), in early morning traffic, and communicating with people based on his use of visual communication.

15.     Mr. Fenicle's vertigo impacts his major life functions because it is exasperated by overstimulation of visual inputs. Specifically, he experiences dizziness upon awaking and must stay still until the dizziness passes; ultimately, it takes 3-4 hours for his vertigo to subside after he gets up; the condition affects his sleep patterns; makes it difficult to follow a schedule starting early in the morning; and is intensified by stop and go traffic. Mr. Fenicle had been taking Clonazepam for his vertigo, but this did not manage the condition.

16.     Mr. Fenicle also suffers from migraine headaches.

17.     Towson University (Defendant Towson) is a member of the University System of Maryland (USM), which is the State of Maryland's public higher education system. USM's 12 institutions, two regional higher education centers, and system office work leverage their collective expertise and resources and share best practices to increase the system's effectiveness and efficiency.

18.    USM is directed by a Board of Regents that is appointed by the Governor of Maryland.

19.    USM, by and through its Board of Regents, has oversight over Defendant Towson. Furthermore, USM developed the Affirmative Action and Equal Opportunity policy VI-1.00, which was approved by the Board of Regents on October 19, 1989.

20.    Defendant Towson also developed and approved a policy entitled 06-01.00-Prohibiting Discrimination On The Basis of Race, Color, Religion, Age, National Origin, Sex and Disability, which is meant to comply with USM's Policy on Affirmative Action and Equal Opportunity, VI-1.00. The policy was approved by the President's Council on December 11, 2001.

21.    Mr. Fenicle began his employment with Defendant Towson as a contract Lecturer in the Audiology, Speech-Language Pathology and Deaf Studies Department (ASLD) in January 2013 for the Spring 2013 term.

22.    As a Lecturer, Mr. Fenicle's primary job responsibilities were teaching courses, which included class room instruction, grading, and holding office hours to meet with students.

23.    Mr. Fenicle's primary supervisor was Dr. Diana Emanuel. Dr. Emanuel also serves as the Chairperson of ASLD.

24.    ASLD is part of the Towson University's College of Health Professions. Dr. Lisa Plowfield is the Dean of the College of Health Professions.

25.    Mr. Fenicle's classes in Spring 2013 were scheduled on Monday, Wednesday, and Friday and began at 8:00 am.

26.    In March 2013, Dr. Jody Cripps, an Associate Professor and co-worker in ASLD, asked Mr. Fenicle to be co-author with him for a grant for an inverted (flipped) ASL classroom.

27.     In May 2013, Dr. Emanuel and Dr. Sheryl Cooper, an Associate Professor and co-worker in ASLD, informed Mr. Fenicle that he was appointed for a ten-month period that aligned with the academic calendar beginning in the Fall 2013.

28.     Mr. Fenicle was told that his contract would be renewed annually based on his teaching performance and that he could have a three-year contract after he was employed as a Lecturer for at least three years by recommendation of the Chairperson and Program Coordinator.

29.     In May 2013, Mr. Fenicle raised concerns about the doorbell system in the Deaf Studies floor that was under renovation with Dr. Emanuel and Dr. Cooper. Specifically, he raised concerns that the system was not in compliance with the Americans with Disabilities Act, as Amended, and noted his need for a proper system as a result of his disabilities.

30.     Dr. Emanuel agreed that Mr. Fenicle was permitted to speak to the contractors who were renovating the floor for the Deaf Studies team about the doorbell.

31.     The next month, Dr. Emanuel insisted that Mr. Fenicle stop discussing the doorbell signal with people who were renovating the Deaf Studies floor.

32.     A few months later, Mr. Fenicle explained to Dr. Emanuel that doorbells in the offices were actually used as fire alarm alerts, not a doorbell signal, and that meant the offices had two separate fire alert signals with no doorbells for the deaf employees. The light of the doorbell signal should blink, unlike a fire alert signal that has a strong strobe alert. Dr. Emanuel told Mr. Fenicle to stop bringing up the doorbell issue in the monthly meeting, so Mr. Fenicle ceased raising the matter as he could see that she became upset whenever he mentioned the doorbell issue.

33.    In June 2013, the proposal for the inverted ASL classroom was approved and the Deaf Studies program received $8,000 from Towson University's Office of Academic Innovation.

34.    In July 2013, Jody Cripps and Mr. Fenicle gave a presentation at the American Sign Language Teachers Association's (ASLTA) Biennial conference in North Carolina.

35.    Mr. Fenicle's classes in Fall 2013 were scheduled on Monday, Wednesday, and Friday and began at 8:00 am.

36.    In August 2013, Mr. Fenicle asked Dr. Emanuel about the flashing light signal that was installed in all of the Deaf Studies (DFST) offices to alert deaf staff when someone was at the door. Specifically, Mr. Fenicle asked Dr. Emanuel to have the bulbs changed to regular blinking bulbs because the lights that had been set up were powerful strobe lights intended to alert people that there was a fire/fire alarm, not to be used as a doorbell. Dr. Emanuel replied, "We can't do anything about it," and Mr. Fenicle stopped talking about it because he did not want to jeopardize his professional relationship after being just hired as a full-time Lecturer.

37.    In August 2013, Mr. Fenicle requested the reasonable accommodation of a larger computer monitor because he had difficulties using the small screen and it caused him issues with his migraines and vertigo. Dr. Emanuel said that there was nothing that she could do about it due to the budget.

38.    Mr. Fenicle decided to bring his own monitor to work after Dr. Cooper told him that it was quite impossible to talk with Dr. Emanuel about accommodations.

39.    In September 2013, Veronica Boulware, a technology coordinator, came over to inspect the computer in Mr. Fenicle's office and told him that the computer needed to be replaced because of some problems that could not be fixed. She told Mr. Fenicle that she could

get him a new one. Dr. Emanuel then asked Mr. Fenicle to provide her a note from his doctor when she found out about his request for a bigger monitor through email correspondence between people from the technology service and Mr. Fenicle.

40.    On September 9, 2013, Dr. Emanuel sent an email that contained the Spring 2014 teaching matrix; Mr. Fenicle's classes began at 8:00 am that semester and were scheduled on Monday, Wednesday, and Friday.

41.    On October 8, 2013, Mr. Fenicle formally requested a reasonable accommodation for a larger computer monitor. Mr. Fenicle was experiencing issues with his vision and requested the computer monitor because he frequently had to turn off the office light in order to work on his computer. As a part of this request, Mr. Fenicle provided medical documentation from Dr. Michelle Price indicating that he suffered from migraines and chronic vertigo. Dr. Emanuel acknowledged receipt of the medical documentation on October 9, 2013.

42.    From October 2013 through October 2015, Mr. Fenicle submitted several Faculty Absence Forms, which listed 'vertigo' as the reason for the absence. The forms had to be approved by Dr. Emanuel.

43.    Mr. Fenicle discussed his vertigo and migraines with Dr. Emanuel when they were ordering the new computer with the larger monitor, which required her approval. During this time, Mr. Fenicle asked Dr. Emanuel to accommodate him with a later schedule and requested to teach classes across five (5) days as opposed to three (3) days; however, Dr. Emanuel stated that she was reluctant to allow Mr. Fenicle to have afternoon classes.

44.    Between 2013 and 2015, Mr. Fenicle had multiple discussions about receiving reasonable accommodation for his vertigo and migraines, as well as his deafness. He frequently

complained about the start time of his classes and how it was negatively impacting his vertigo disability.

45.     Despite repeated requests, Defendant Towson, by and through Dr. Emanuel, did not provide sufficient reasonable accommodation.

46.     In November 2013, Dr. Cooper and Dr. Cripps told Mr. Fenicle that they were concerned about his health because they noticed that he had experienced vertigo attacks a few times throughout the year. Mr. Fenicle explained to them that it usually took about an hour for him to get out of bed after he woke up early in the morning, and bumper-to-bumper traffic would trigger his vertigo.

47.     They asked Mr. Fenicle if it would be helpful if he taught later in the day and Mr. Fenicle told them that it is very possible that would help because he noticed that he would have less vertigo attacks if he woke up later in the morning. They advised him that he should try to start teaching later in the day and to ask Dr. Emanuel.

48.     When he discussed the issue with Dr. Emanuel, she asked how early he can show up, and Mr. Fenicle suggested that they should try 10:00 am in the morning; however, Dr. Emanuel told him that he could not start to teach after 10:00 am until the Fall 2014 semester.

49.     In December 2013, Mr. Fenicle received his course evaluations for the Fall 2013 term. They were as follows:

| | |
|---|---|
| DFST 104-003 (ASL I) | 4.10/5 |
| DFST 104-004 (ASL I) | 3.93/5 |
| DFST 104-005: (ASL I) | 4.28/5 |
| DFST 204-002: (ASL III) | 4.01/5 |
| DFST 301-001: (ASL V) | 3.70/5 |

50.     Mr. Fenicle's classes in Spring 2014 were scheduled on Monday, Wednesday, and Friday and began at 8:00 am.

51.     In January 2014, Dr. Cripps and Mr. Fenicle demonstrated an interactive project of the inverted ASL classroom at Towson University during the January Conference.

52.     That same month, Dr. Emanuel showed Mr. Fenicle the schedule for the Fall 2014 term.

53.     On February 5, 2014, Mr. Fenicle sent an email to Sheryl Cooper and copied Dr. Emanuel, and Jody Cripps, which stated that he would not be in to work that day because he was still sick from vertigo and that he had emailed his students about the class cancellation and assignments to prepare for their class on Friday.

54.     On February 19, 2014, Mr. Fenicle received a peer evaluation performed by Dr. Smart for his DFST 104 (ASL I) course – he received a 5 out of 5.

55.     In March 2014, Mr. Fenicle gave a presentation at the Strategic Alternative Learning Techniques (SALT) Roundtable in University of Arizona.

56.     That same month, Dr. Emanuel instructed Mr. Fenicle to refrain from talking to the interpreter about leaving early after he politely asked the interpreter to stay in a meeting instead of leaving early.

57.     In March 2014, Mr. Fenicle had a discussion with Dr. Cooper about an issue with assignments that students might not be able to complete due to several class cancelations as a result of school closings from snowstorms. Dr. Cooper suggested that Mr. Fenicle discuss the matter with Dr. Emanuel, which he did. Dr. Emanuel agreed that it would be a good idea for Mr. Fenicle to modify the due dates for the assignments and to discuss the changes with the students in his class.

58.     In April 2014, Dr. Cripps and Mr. Fenicle gave a presentation at the Deaf Studies Today Conference in Utah Valley University.

10

59.     Later that same month, Dr. Emanuel asked Mr. Fenicle to meet with her immediately and she explained that some students from her ASL V class complained to her about changes in the assignments. Mr. Fenicle explained that he took her advice about extending the deadline of assignments due to inclement weather and some students expected him to waive the requirement to perform their assignments instead.

60.     Dr. Emanuel told Mr. Fenicle that some students who were under her supervision in the Speech-Language Pathology & Audiology program (SPPA) were upset about their grades because they needed to have at least a 'B' or they would have to re-take the class in order to continue their speech-language program. Mr. Fenicle explained to her that he has been extremely flexible with regard to the assignments, that he had already extended the deadlines, and that he eliminated the last two assignments.

61.     In May 2014, Mr. Fenicle received his course evaluations for the Spring 2013 term. They were as follows:

| | | |
|---|---|---|
| DFST 104-001 (ASL I) | 4.33/ 5 |
| DFST 114-001 (ASL I) | 4.25/ 5 |
| DFST 205-001 (ASL IV) | 3.10/ 5 |
| DFST 205-002 (ASL IV) | 3.76/ 5 |
| DFST 301-001 (ASL V) | 2.96/ 5 |

62.     Mr. Fenicle attributed the low course evaluation score for the ASL V class to those students who complained to Dr. Emanuel about the assignment deadlines and grades.

63.     Many of the comments in the course evaluation for ASL V focused on dissatisfaction with the "flipped" classroom structure of the class.

64.     Furthermore, one student's comment perfectly echoed the sentiments of Mr. Fenicle when he discussed with Dr. Emanuel that the low scores were attributable to students who were dissatisfied with their grades and having to do assignments: "…students need to be

held accountable when there is no work present. I feel like there are many students in the class who held up our progress for their failure to do the work before hand, or lack of understanding the videos. This made it impossible for [Mr. Fenicle] to help us in class with what we were supposed to be doing. I feel like no matter how well organized he was, if the students weren't doing the work, it would not have mattered."

65.    One student from the ASL V class told Mr. Fenicle that several students told other students to make negative comments about Mr. Fenicle when they were doing their course evaluation at the ASL lab because they wanted to jeopardize Mr. Fenicle's reputation as a Lecturer.

66.    Some students also told Mr. Fenicle that Dr. Emanuel encouraged them to make negative comments about Mr. Fenicle's teaching when they completed the course evaluations.

67.    Mr. Fenicle's classes in Summer 2014 were scheduled on Monday, Wednesday, and Friday and began at 10:30 am. Mr. Fenicle taught two summer classes, ASL IV and V.

68.    Mr. Fenicle's classes in Fall 2014 were scheduled on Monday, Tuesday Wednesday, Thursday and Friday and the earliest class began at 10:00 am. This later schedule did not alleviate his early morning symptoms related to his vertigo.

69.    In August 2014, Mr. Fenicle learned that the ASLD Promotion, Tenure, Reappointment and Merit (PTRM) Committee wanted to hold his Annual Review (AR) at the end of the Fall 2014 semester because of the complaints that were made to Dr. Emanuel in the Spring 2014 term regarding the changes to the assignment deadlines, and low grades.

70.    That same month, Dr. Emanuel told Mr. Fenicle that he could not teach ASL V classes, the most advanced ASL class, because of his "ineffectiveness" in the particular course.

71.    On August 19, 2014, Dr. Cooper sent an email about the ASL V class issue. Dr. Cooper and Dr. Cripps told Mr. Fenicle that Dr. Emanuel had concerns about Mr. Fenicle's ability to teach ASL V successfully and that she considered finding someone else to teach ASL V during Fall 2014. They further stated that they felt confident that he had the necessary skills to teach the ASL V class and talked with Dr. Emanuel about allowing Mr. Fenicle to teach that class. It was decided that the Fall 2014 semester would be a probationary period for that class and Mr. Fenicle could be able to prove his strengths as a teacher of that course.

72.    On August 29, 2014, the ASLD PTRM Committee met and issued a determination that stated that Mr. Fenicle should receive no merit.

73.    In the determination, it is noted that Mr. Fenicle rated excellent in the area of scholarship, rated excellent in the area of service, paced his class well and made excellent use of the Smartboard. Mr. Fenicle was reappointed for the next academic year – 2015-2016.

74.    In September 2014, Mr. Fenicle reminded Dr. Emanuel to make a request for an interpreter so she could conduct her peer evaluation in his ASL V class. Dr. Emanuel is not fluent in American Sign Language (ASL) and she could barely understand signed conversations, especially in the ASL V class due to her limited ASL skills. She replied that she would not need the interpreter.

75.    During Dr. Emanuel's observation of Mr. Fenicle's ASL V class, she kept speaking (verbally without the use of sign language) with a few students during his lecture and student participation portions of the class, even though she was fully aware that no one should use their voice in that class.

76.    Mr. Fenicle received a mediocre peer evaluation from Dr. Emanuel – Dr. Emanuel rated him a 3.6 out of 5. Mr. Fenicle was shocked because the other peer evaluation by

Dr. Cooper was excellent – he received a 4.68 out of 5. Mr. Fenicle explained to Dr. Emanuel that he did not agree with her evaluation and she remarked, "You can write your disagreement if you feel that it is necessary." When Mr. Fenicle asked her to whom he could submit his disagreement, she pointed with her index finger on her chest using a stern facial expression to indicate the disagreement had to be filed with her. Mr. Fenicle ultimately decided not to write the letter due to his probationary status.

77.    In her peer evaluation of Mr. Fenicle, Dr. Emanuel  mentioned that Mr. Fenicle should not be in front of the screen when he signed because she was unable to see him signing while he was directly under the light from the projector of the Smartboard that was attached to the ceiling. Mr. Fenicle informed Dr. Emanuel that she was already aware about that particular problem because he had previously shared his concern about that issue several times before. In fact, Mr. Fenicle reminded her that she had ordered a large touch screen (which did not require the projector) and it was installed in the meeting room instead of the classroom. The Deaf Studies team asked her why the touch screen was not installed in the classroom instead of a meeting room because it was rarely used in the meeting room. Ms. Emanuel responded that the team should just appreciate having the touch screen.

78.    In October 2014, Mr. Fenicle told Dr. Emanuel and Dr. Cooper that he was still having vertigo attacks and noticed that he felt dizzy in the mornings. He explained to them that he thought traffic would be better after 9:00 am to accommodate a 10:00 am start time for classes, but that traffic was still bad at that time. He asked if his class schedule could be moved to after 11:00 am so he could avoid traffic in the morning and to reduce his vertigo symptoms.

79.    Dr. Emanuel was agitated when Mr. Fenicle asked if he could teach classes after 11:00 am. Dr. Cooper told her that some of their colleagues were willing to switch their classes with Mr. Fenicle's but Dr. Emanuel said that she would not do that for the Spring 2015 semester.

80.    Dr. Emanuel refused to allow Mr. Fenicle to teach two evening classes that were already listed for Spring 2015 when he asked if he could teach those classes instead of his two morning classes.

81.    During the program meeting in October 2014, Mr. Fenicle asked Dr. Cooper about Deaf Studies being part of the Foreign Language Department, which is under the College of Liberal Arts, instead of the College of Health Professions. He asked if it was possible for them to meet with people at the Foreign Language Department. Dr. Cooper replied that she would not have time for such a meeting, but that Mr. Fenicle could meet with the Foreign Language Department if Dr. Cripps was willing to attend, because it would be more appropriate for Mr. Fenicle to go with one of the Professors to meet with the Chairperson of another Department.

82.    Subsequently, Dr. Emanuel asked Mr. Fenicle why he wanted to meet with the Chairperson at the Foreign Language Department. Mr. Fenicle explained to her that he would like to discuss Deaf Studies courses with someone from that Department because the Deaf Studies program and the Foreign Language Department had similar goals and issues unlike with the audiology and speech language programs. This was a view shared by faculty from Deaf Studies.

83.    Dr. Emanuel told Mr. Fenicle that he could meet with them as long as either Dr. Cooper or Dr. Cripps also attended.

84.    In November 2014, Dr. Cripps, Dr. Cooper and Mr. Fenicle gave a presentation at the Maryland American Sign Language Teachers Association at McDaniel College.

85.     That same month, during a Department meeting, Mr. Fenicle raised a concern about the reliance on course evaluations. He noted that there needs to be consideration of the response rates for course evaluations and they were not one hundred percent accurate and reliable.

86.     In December 2014, Dr. Cripps and Mr. Fenicle met with the Chairperson of the Foreign Language Department. The Chairperson indicated that they would like for the Deaf Studies program to be a part of the Foreign Language Department.

87.     In December 2014, Mr. Fenicle received his course evaluations for the Fall 2014 term. They were as follows:

| | |
|---|---|
| DFST 101-001 (Intro to Deaf Studies) | 4.40/ 5 |
| DFST 101-002 (Intro to Deaf Studies) | 4.50/ 5 |
| DFST 104-001 (ASL I) | 4.70/ 5 |
| DFST 204-001 (ASL IV) | 4.30/ 5 |
| DFST 304-001 (ASL V) | 4.50/ 5 |

88.     In December 2014, and in preparation for the Spring 2015 semester, Mr. Fenicle requested and was denied a reasonable accommodation to have his classes moved to a later start time.

89.     Dr. Emanuel informed Mr. Fenicle that it was too late to modify his schedule, despite his request also being made two months prior.

90.     In January 2015, Dr. Emanuel informed Mr. Fenicle that the PTRM committee recommended that he would be reappointed for the 2015-2016 term.

91.     That same month, Dr. Cripps and Mr. Fenicle gave a presentation at the Modern Language Association Conference in Vancouver, British Columbia.

92.     Mr. Fenicle's classes in Spring 2015 were scheduled on Monday, Tuesday Wednesday, Thursday and Friday and the earliest class began at 10:00 am.

93.     In February 2015, Dr. Cripps and Mr. Fenicle met with the Dean of the College of Health Profession, Dr. Lisa Ann Plowfield, about several issues including classroom sizes, the lighting systems in classrooms, the doorbell system in faculty offices, and Dr. Emanuel's treatment and behavior toward the Deaf Studies Program team. Dean Plowfield suggested that Mr. Fenicle share his concerns about the doorbell system during the Department meeting later in the spring. Dean Plowfield also agreed that the Deaf Studies program should explore possibilities of working with the Foreign Language Department.

94.     Mr. Fenicle explained the issue to ASLD colleagues during the Department meeting in the spring. When Dean Plowfield asked Dr. Emanuel if she had done anything about this matter, Dr. Emanuel said that she was not previously aware of the issue and would follow up on it.

95.     Dr. Emanuel was upset when she learned that Dr. Cripps and Mr. Fenicle actually met with the Foreign Language Department. She told Dr. Cripps and Mr. Fenicle that people from the College of Liberal Arts had no desire to work with them and they should communicate only with her whenever they have meetings with the different departments, despite the fact that the matter was discussed with Dr. Emanuel before receiving approval to meet with the Foreign Language Department.

96.     Dr. Cooper later told Mr. Fenicle that Dr. Emanuel assumed that he would never meet with the Foreign Language Department.

97.     In March 2015, Dr. Emanuel attended the program meeting and instructed Mr. Fenicle to only communicate with her directly whenever he wanted to contact or talk to people from different Departments and Colleges, as well as administrative people. She also told staff that they should notify her whenever they wanted to talk with Dean Plowfield.

17

98.     That same month, Dr. Cripps and Mr. Fenicle gave a presentation at the Forging

Linguistic Identities Conference hosted by the Department of Foreign Languages at Towson

University.

99.     In April 2015, Dean Plowfield asked Mr. Fenicle if he wanted to discuss anything

during the Department meeting, in which Dr. Emanuel was present. Mr. Fenicle explained to

colleagues about the doorbell system issue that had been ongoing since the summer 2013. Mr.

Fenicle mentioned that this issue was brought to Dr. Emanuel's attention a few times and it

appeared that there was no action being taken to correct the problem.

100.    Dean Plowfield asked Dr. Emanuel if she was aware of the issue and she replied

to the Dean, "No, I didn't know about it."

101.    Dr. Cooper and Dr. Cripps immediately looked at Mr. Fenicle with shock; they

were all appalled that Dr. Emanuel would lie about not knowing about this issue as Mr. Fenicle

had discussed it previously with her.

102.    In May 2015, Mr. Fenicle received his course evaluations for the Spring 2015

term. They were as follows:

DFST 101-001 (Intro to Deaf Studies)        4.50/ 5
DFST 101-002 (Intro to Deaf Studies)        4.50/ 5
DFST 114-001 (ASL I Honors)                 4.70/ 5
DFST 205-001 (ASL IV)                       3.50/ 5
DFST 205-002 (ASL IV)                       4.50/ 5

103.    Mr. Fenicle also received a peer evaluation performed by Dr. Cripps for his DFST

205-002 (ASL IV) course – he received a 5 out of 5.

104.    Mr. Fenicle's classes in Summer 2015 were scheduled on Monday, Wednesday,

and Friday and began at 9:30 am.

105.    During the summer session, one of Mr. Fenicle's students came over to talk with him about a personal problem and they agreed to see Dr. Emanuel about her issue. While they were on the way to Dr. Emanuel's office, Mr. Fenicle saw another student and informed her to let the other students know that he might be at the ASL lab a little late because he was helping the other student deal with a personal problem.

106.    When they arrived at Dr. Emanuel's office and asked the receptionist about her whereabouts, they learned that Dr. Emanuel was not in her office but would be back soon. They waited for a short time, but Mr. Fenicle then decided he had to leave the Department office to go to his class because it was almost 9:45 am. When Mr. Fenicle arrived at his classroom, students informed him that Dr. Emanuel had been there waiting for him.

107.    Later that day, Mr. Fenicle received an email from Dr. Emanuel about his "lateness to class" even though, as he explained to her, he had been at her office waiting for her in an attempt to help a student in crisis.

108.    In June 2015, Dr. Cripps, Dr. Cooper and Mr. Fenicle gave a presentation at the ASLTA's Biennial Conference in Minnesota.

109.    In August 2015, the Deaf Studies team learned that Dr. Emanuel had deactivated the Smartboard in the classrooms without warning; she stated that she felt it was unnecessary even though she knew that deaf Lecturers had been using it despite some of its lighting drawbacks. The Smartboard was a good tool to use for teaching, although the touch screen system would have been much better due to the lighting issues. A few weeks later, Mr. Fenicle had his annual meeting with Dr. Emanuel to discuss his reappointment.

110.    In August 2015, Mr. Fenicle talked with Dr. Emanuel about his reappointment and AR. Dr. Emanuel she that she was satisfied with his Annual Review and later emailed to let him know that his AR was good. This led Mr. Fenicle to believe that he would be reappointed.

111.    On the day that all ASLD faculty members were required to report to work for the Fall semester, Mr. Fenicle asked why the interpreter left early after the staff asked her to stay. Dr. Emanuel told Mr. Fenicle that he should stop complaining because no one else complained about the interpreter except him.

112.    That same month, Dr. Emanuel discontinued the program that enabled staff to use the Smartboard, a tool Mr. Fenicle regularly utilized in his classes.

113.    On August 25, 2015, the ASLD PTRM Committee met to review Mr. Fenicle and decided to not renew his appointment for the next academic year.

114.    On August 26, 2015, Mr. Fenicle was assigned to teach American Sign Language I, but Dr. Emanuel decided to assign Mr. Fenicle to teach DFST 308, Fingerspelling and Numbers instead.

115.    On August 26, 2015, Mr. Fenicle submitted a copy of his Teaching Schedule Request Form for Spring 2016 to Dr. Emanuel and asked if she wanted to discuss this with him. In that Request form, Mr. Fenicle indicated that he preferred classes to start at 11:00 am or later due to his medical condition (vertigo) and to teach classes over five workdays.

116.    On August 27, 2015, Dr. Emanuel sent a letter entitled: Re-appointment review for Ron Fenicle to Dean Plowfield recommending that Mr. Fenicle not be reappointed as a Lecturer for 2016-2017 based on: a) lateness to class despite multiple reminders and adjustments of his teaching schedule that removed early morning classes, and b) lack of collegiality/civility in

respect to faculty and students, which includes refusing to accept responsibility for his job performance issues that resulted in faculty or student complaints.

117.     Mr. Fenicle's classes in Fall 2015 were scheduled on Monday, Tuesday Wednesday, Thursday and Friday and the earliest class began at 11:00 am on Tuesday and Thursday.

118.     On September 1 and 2, 2015, Mr. Fenicle communicated with Dr. Emanuel regarding adjustments to his course schedule for DFST 101 due to his disability.

119.     On September 28, 2015, Mr. Fenicle received notice of his non-reappointment and signed the Department Summary Recommendation form that states the recommendation of the ASLD department to not reappoint him.

120.     Though Mr. Fenicle had attempted to meet with Dr. Emanuel prior to that time, Dr. Emanuel canceled two prior appointments. Dr. Emanuel informed Mr. Fenicle that she decided to not have him reappointed for 2016-17.

121.     Mr. Fenicle was shocked because he felt he would not have to worry about reappointment based on prior assurances and his work performance.

122.     Dr. Emanuel told Mr. Fenicle that even if his health condition improved and he showed he could arrive at class on time for the entire academic year she would not reconsider her decision.

123.     She also informed Mr. Fenicle that he would not be allowed to teach summer courses after the Spring 2016 semester.

124.     Subsequently, Mr. Fenicle communicated to Dean Plowfield his concern that Dr. Emanuel participated in the PTRM meeting and provided false and misleading negative information about his performance to support non-reappointment.

125.    The registration and enrollment totals for Mr. Fenicle's DSFT 101 classes for Fall 2015 were the largest ever for ASLD - 45 students for DSFT 101-001 and 44 for DSFT 101-002.

126.    In addition, Mr. Fenicle had to race from one class to the other because they were separated by such vast distance that it took roughly ten minutes to walk between the two classrooms and he only had fifteen minutes in between the two classes.

127.    In October 2015, Dr. Cooper told Mr. Fenicle that she spoke with Dr. Emanuel about the class sizes and classroom locations for the two DFST 101 classes. Dr. Emanuel told Dr. Cooper that she would reduce the class sizes to 35 students for each DFST 101 class and that she had assigned two classrooms that were in the same building and a few rooms apart from each other. However, the classes were still far away from the ASLD building.

128.    In October 2015, Mr. Fenicle explained to his colleagues in the Deaf Studies program that Dr. Emanuel decided not to reappoint him for the 2016-17 academic year because of two reasons – tardiness and lack of civility in respect to faculty and students.

129.    On October 18, 2015, Mr. Fenicle sent Dean Plowfield a 'Letter of Appeal' regarding his non-reappointment as Lecturer in the Deaf Studies program for the 2016-2017 academic term. In the Letter, Mr. Fenicle noted that he disagreed with the reasons provided for his non-reappointment, that he had asked Dr. Emanuel to have his schedule altered to accommodate his health issues, and that there were no issues with his job performance and ability to get along with faculty and students.

130.    On October 20, 2015, Dean Plowfield was presented with a Letter signed by Jason Begue, Sheryl Cooper, Jody Cripps, Kathleen Hajamacha, and Sagar Kothari that announced their support for retaining Mr. Fenicle. Specifically, this letter highlighted numerous

examples of his commitment, dedication, and creativity that has enhanced the quality and reputation of the Deaf Studies program.

131.    This Letter states that the signers, who are Mr. Fenicle's colleagues, respectfully disagree with the PTRM committee's statement that Mr. Fenicle was not getting along with the other faculty in the Deaf Studies program. Dr. Emanuel, Dr. Paul Evitts, and Mr. Fenicle were copied on this letter.

132.    Dr. Paul Evitts is an Associate Professor in the Department of Audiology, Speech-Language Pathology and Deaf Studies at Towson University; he served as the Promotion, Tenure, Reappointment and Merit Committee Chairperson in August 2015.

133.    The Deaf Studies staff never received a response from Dean Plowfield and at least two Professors were chastised by Dr. Emanuel after she learned about the Letter.

134.    On October 21, 2015, Dean Plowfield sent a letter to Mr. Fenicle stating that there was no right to appeal the Department's recommendation of his non-reappointment. Dean Plowfield instructed Mr. Fenicle that she had to deny his appeal because Towson University does not allow any Lecturers to file an appeal about the PTRM's decision.

135.    When Mr. Fenicle explained that the ASLD PTRM's policy stated it allowed all faculty to file an appeal, Dean Plowfield responded that was a mistake and needed to be corrected in the printed guidance.

136.    In October 2015, and thereafter, Mr. Fenicle engaged in several meetings with Dan Leonard, the Fair Practices Officer/Title IX Coordinator/ADA Coordinator. During these discussions, Mr. Fenicle indicated that he was being subjected to disability discrimination when he was denied reasonable accommodation and was issued his notice of non-reappointment.

137.    Mr. Fenicle subsequently submitted a written letter outlining his opposition to the Agency's actions with regard to his requests for reasonable accommodation and the decision regarding his non-reappointment.

138.    During the meeting on November 4, 2015, Mr. Leonard informed Mr. Fenicle that he needed to complete and submit a Faculty and Staff Accommodation Request Form.

139.    On November 5, 2015, Mr. Fenicle submitted a Faculty and Staff Accommodation Request Form, which states that he has a permanent or long term disability that affects his ability to perform his work duties due to disorientation, severe dizziness, inability to maintain balance, and nausea due to vertigo. The requested accommodation was teaching classes between 11 am and 6:30 pm.

140.    Dr. Cooper, Mr. Fenicle's Program Director, had also previously requested later start times for Mr. Fenicle's classes due to his known vertigo.

141.    Dr. Emanuel agreed to alter Mr. Fenicle's schedule with classes that begin at 11 am or later for Fall 2015. Mr. Fenicle did not experience any instances of tardiness for Fall 2015 or Spring 2016 after this schedule changed.

142.    Dr. Sheryl Cooper and Jason Begue, a Lecturer and co-worker in ASLD, successfully had their schedules modified due to personal, non-medical reasons; Dr. Cooper's schedule was modified two days prior to the start of student registration.

143.    On November 6, 2015, Dr. Nathaniel Carter provided a letter to Defendant Towson, by and thru Dan Leonard, which states that Mr. Fenicle has been a patient of his office since January 17, 2014, for vertigo, tinnitus, and hearing loss (congenital deafness). Furthermore, this letter states that Mr. Fenicle's dizziness is worse in the mornings and when driving in heavy

24

traffic. Dr. Carter further elaborates that there has been a reduction in the symptoms with medical therapy (taken each morning) and the recent adjustment to his work schedule.

144.    In the end of November and December 2015, Mr. Fenicle emailed and called Mr. Leonard a few times for several weeks but received no response. Mr. Leonard had informed Mr. Fenicle in the meeting on November 4, 2015, that he would contact Mr. Fenicle in a couple of weeks and that he planned to interview Mr. Fenicle's colleagues. Mr. Fenicle's colleagues informed him that they were never contacted by or talked to Mr. Leonard.

145.    On December 7, 2015, Dean Plowfield sent Mr. Fenicle a letter that served as formal notification of non-renewal of his appointment as a Lecturer.

146.    On December 16, 2015, Mr. Fenicle ran into Mr. Leonard at the Holiday Winter Fest in the University Union. Mr. Leonard said that he would call Mr. Fenicle about his non-reappointment issue before the winter break, but never did.

147.    Mr. Fenicle subsequently contacted Marina Cooper, Bias/Hate Response Team member, because he wanted to talk with someone about Dr. Emanuel's continuous harassment toward him. She explained that she would contact Mr. Fenicle after she talked to Mr. Leonard, but never did.

148.    In December 2015, Mr. Fenicle received his course evaluations for the Fall 2015 term. They were as follows:

DFST 101-001 (Intro to Deaf Studies)        4.30/5
DFST 101-002 (Intro to Deaf Studies)        4.00/5
DFST 304-001 (ASL V)                        4.60/5
DFST 304-002 (ASL V)                        4.20/5
DFST 308-001 (Fingerspelling & Nbrs)        4.60/5

149.    Mr. Fenicle did not receive a peer evaluation because Defendant Towson determined that it was not necessary after his annual contract was not renewed.

150.    During the Spring 2016, Mr. Fenicle's earliest classes started at 2:00 pm on Tuesday and Thursday; and 3:30 pm on Monday and Wednesday.

151.    In January 2016, Mr. Fenicle emailed Mr. Leonard because he had not received any response about his prior discussions.

152.    On January 19, 2016, Mr. Fenicle submitted a letter to the President's Office, addressed to Dr. Timothy Chandler, the Provost and Executive Vice President for Academic Affairs, initiating an Appeal of his non-reappointment based on a violation of his rights under the ADA.

153.    On February 8, 2016, Mr. Leonard issued a letter indicating that he investigated Mr. Fenicle's claims of disability discrimination and found no factual basis to support such a finding. Mr. Fenicle was informed, per the letter, that he could appeal that decision.

154.    Mr. Fenicle subsequently requested and was granted an extension of time to file an appeal.

155.    On March 22, 2016, Mr. Fenicle submitted a letter that served as a formal appeal of Mr. Leonard's determination that no disability discrimination occurred which resulted in the non-reappointment decision.

156.    In March 2016, Mr. Fenicle informed several of his students that he would not return to Towson University after the Spring 2016 semester after they asked him about whether he would be teaching ASL IV during the summer session.

157.    On April 11, 2016, Dr. Emanuel was presented with a Petition that was started by 'Towson Students to keep Ron [Mr. Fenicle] at Towson', which had amassed 728 signatures and over 100 comments highlighting the positive impact and collegial nature that Mr. Fenicle has with his students.

158.    On April 18, 2016, faculty from the Deaf Studies program discussed several concerns with Mr. Leonard and others, including issues involving Mr. Fenicle and his non-reappointment.

159.    On May 4, 2016, Mr. Phillip Ross, Associate Vice President for Human Resources, emailed Mr. Fenicle to inform him that President Schatzel asked for Mr. Ross to conduct an independent review of Mr. Fenicle's appeal. Between May and August 2016, Mr. Fenicle corresponded with Mr. Ross regarding the appeal.

160.    In May 2016, Mr. Fenicle received his course evaluations for the Spring 2015 term. They were as follows:

DFST 101-001 (Intro to Deaf Studies)        4.30/5
DFST 101-002 (Intro to Deaf Studies)        4.00/5
DFST 304-001 (ASL V)                        4.60/5
DFST 304-002 (ASL V)                        4.20/5
DFST 308-001 (Fingerspelling & Nbrs)        4.60/5

161.    Mr. Fenicle did not receive a peer evaluation because Defendant Towson determined that it was not necessary after his annual contract was not renewed.

162.    The Spring 2016 Comment Report, included numerous statements of support from students who noted Mr. Fenicle 'made the class enjoyable,' was 'very encouraging and engaging,' 'passionate and understanding of people of different backgrounds,' the best thing about the courses he taught, an 'excellent professor,' 'the best professor in the Deaf Studies program,' and that he should not be fired, among many other positive sentiments.

163.    Based on his non-reappointment, Mr. Fenicle's employment ended in June 2016.

164.    On June 30, 2016, Mr. Fenicle initiated a complaint of discrimination with the Equal Employment Opportunity Commission.

165.    On July 14, 2016, President Kim Schatzel denied Mr. Fenicle's appeal, affirmed Mr. Leonard's decision, and confirmed Mr. Ross's findings of no discrimination.

166.    When asked by the Maryland Division of Unemployment for a copy of its tardiness policy, Towson University stated that it does not have a tardiness policy for its employees.

167.    Mr. Fenicle was subjected to harassment and discrimination based on his disabilities and in retaliation for engaging in protected EEO activity when, among other things, he was denied multiple reasonable accommodations, he was denied a merit contribution in August 2014, he was treated disparately with regard to class schedules and performance evaluations, he was denied reappointment in August 2015, Dr. Emanuel did not recommend him for reappointment based on false and misleading information, he was denied the opportunity to teach classes in the Summer 2016 term, his appeals of the decision to not reappoint him were denied, his complaints of disability discrimination were denied, and he was terminated from his employment.

168.    These actions constitute violations of the Americans with Disabilities Act, as Amended, including Titles I, II and V; Title VII of the Civil Rights Act of 1964, as amended; the Rehabilitation Act of 1973, including Section 504; 42 U.S.C. § 1983; and the Maryland State Government Article § 20-601, et. seq., as asserted in the following Counts.

<u>Count I</u>
**(Americans with Disabilities Act, as Amended – Title I)**

169.    Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

170.    Mr. Fenicle is a qualified individual with a disability. He suffers from a physical or mental impairment that substantially limits him in major life activities, has a record of his impairment and/or was perceived as disabled.

171.    Mr. Fenicle was able to perform the essential functions of his position with or without accommodation.

172.    Between 2013 and 2015, Mr. Fenicle frequently requested reasonable accommodations for his medical impairments.

173.    Defendants' conduct as described in this Complaint constitutes discrimination on the basis of disability in violation of the ADAAA and its implementing regulations.

174.    Defendants violated the law when it failed to provide reasonable accommodation to Mr. Fenicle, including failure to modify his class schedule.

175.    Defendants permitted non-disabled employees to modify their class schedules despite providing less notice and having no medical reasons for such modifications.

176.    Defendants violated the law when it denied requests for reasonable accommodation without sufficient cause or basis and failed to engage in the interactive process.

177.    In sum, Mr. Fenicle, a qualified individual, was exposed to disadvantageous terms or conditions of employment to which non-disabled employees are not exposed.

178.    As a result of Defendants' acts or omissions, Mr. Fenicle's medical conditions were exacerbated.

179.    Defendants violated the law when, as result of Defendants' failure to provide reasonable accommodations for Mr. Fenicle's disability, the Defendants refused to reappoint Mr. Fenicle to his position for the 2016-2017 academic year.

180.    Defendants violated the law when it terminated Mr. Fenicle because of his disability and denied his appeals.

181.    Mr. Fenicle has suffered economic and noneconomic damages in the past and continuing through the present. His damages as a result of Defendants' actions are ongoing.

WHEREFORE, Plaintiff demands judgment against Defendant for equitable relief, economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than five hundred thousand dollars ($500,000.00), plus interest, fees, and costs, including reasonable attorneys' fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, and such other and further relief this Honorable Court determines just and equitable, including all available statutory, equitable relief, and injunctive relief. Plaintiff further specifically demands prospective injunctive relief in the form of an order of reinstatement to his position and an order proscribing the unlawful conduct described in this Complaint.

## Count II
### (Americans with Disabilities Act, as Amended – Title II)

182.    Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

183.    Mr. Fenicle is a qualified individual with a disability. He suffers from a physical or mental impairment that substantially limits him in major life activities, has a record of his impairment and/or was perceived as disabled.

184.    Mr. Fenicle was able to perform the essential functions of his position with or without accommodation.

185.    Between 2013 and 2015, Mr. Fenicle frequently requested reasonable accommodations for his medical impairments.

186.    Mr. Fenicle was excluded from or denied the benefits of Defendant Towson University's services.

187.    Defendants' conduct as described in this Complaint constitutes discrimination on the basis of disability in violation of the ADAAA and its implementing regulations.

188.    Defendants violated the law when it failed to provide a proper doorbell system and lighting system in classrooms for use by Mr. Fenicle and deaf or hard of hearing users.

189.    Defendants violated the law when it failed to provide reasonable accommodation to Mr. Fenicle, including failure to modify his class schedule.

190.    Defendants permitted non-disabled employees to modify their class schedules despite providing less notice and having no medical reasons for such modifications.

191.    Defendants violated the law when it denied requests for reasonable accommodation without sufficient cause or basis and failed to engage in the interactive process.

192.    In sum, Mr. Fenicle, a qualified individual, was exposed to disadvantageous terms or conditions of employment to which non-disabled employees are not exposed.

193.    As a result of Defendants' acts or omissions, Mr. Fenicle's medical conditions were exacerbated.

194.    Defendants violated the law when, as a result of Defendants' failure to provide reasonable accommodation for Mr. Fenicle's disability, the Defendants refused to reappoint Mr. Fenicle to his position for the 2016-2017 academic year.

195.    Defendants violated the law when it terminated Mr. Fenicle because of his disability and denied his appeals.

196.     Mr. Fenicle has suffered economic and noneconomic damages in the past and continuing through the present. His damages as a result of Defendants' actions are ongoing.

WHEREFORE, Plaintiff demands judgment against Defendant for equitable relief, economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than five hundred thousand dollars ($500,000.00), plus interest, fees, and costs, including reasonable attorneys' fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, and such other and further relief this Honorable Court determines just and equitable, including all available statutory, equitable relief, and injunctive relief. Plaintiff further specifically demands prospective injunctive relief in the form of an order of reinstatement to his position and an order proscribing the unlawful conduct described in this Complaint.

## Count III
### (Americans with Disabilities Act, as Amended – Title V)

197.    Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

198.    Mr. Fenicle is a qualified individual with a disability. He suffers from a physical or mental impairment that substantially limits him in major life activities, has a record of his impairment and/or was perceived as disabled.

199.    Mr. Fenicle was able to perform the essential functions of his position with or without accommodation.

200.    Between 2013 and 2015, Mr. Fenicle frequently requested reasonable accommodations for his medical impairments.

201.    Defendants' conduct as described in this Complaint constitutes discrimination on the basis of retaliation in violation of the ADAAA and its implementing regulations based on Mr. Fenicle's opposition and objection to acts and omissions in violation of Title I and Title II of the ADAAA on the part of Defendants.

202.    Defendants violated the law when it failed to provide reasonable accommodation to Mr. Fenicle, including failure to modify his class schedule.

203.    Defendants permitted non-disabled employees to modify their class schedules despite providing less notice and having no medical reasons.

204.    Defendants violated the law when it denied requests for reasonable accommodation without sufficient cause or basis and failed to engage in the interactive process.

205.    After requesting the reasonable accommodations and participating in the protected activities described in this Complaint, Defendants violated the law when it retaliated against Plaintiff, including but not limited to denial of multiple reasonable accommodations, denial of a merit contribution in August 2014, subjecting him to disparate treatment with regard to class schedules and performance evaluations, denial of reappointment in August 2015, Dr. Emanuel did not recommend him for reappointment based on false and misleading information, he was denied the opportunity to teach classes in the Summer 2016 term, his appeals of the decision to not reappoint him were denied, his complaints of disability discrimination were denied, and he was terminated from his employment.

206.    Defendants violated the law when it denied Mr. Fenicle a merit contribution on August 29, 2014.

207.    Defendants violated the law when it failed to reappoint Mr. Fenicle for his position and circulated false charges of lacking congenial nature with faculty and students.

208.    Defendants violated the law when it denied Mr. Fenicle's appeals of the decision of non-reappointment and his complaints of disability discrimination.

209.    In sum, Mr. Fenicle, a qualified individual, was exposed to disadvantageous terms or conditions of employment to which non-disabled employees are not exposed and was subjected to retaliation thereafter.

210.    Mr. Fenicle has suffered economic and noneconomic damages in the past and continuing through the present. His damages as a result of Defendant's actions are ongoing.

WHEREFORE, Plaintiff demands judgment against Defendant for equitable relief, economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than five hundred thousand dollars ($500,000.00), plus interest, fees, and costs, including reasonable attorneys' fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, and such other and further relief this Honorable Court determines just and equitable, including all available statutory, equitable relief, and injunctive relief. Plaintiff further specifically demands prospective injunctive relief in the form of an order of reinstatement to his position and an order proscribing the unlawful conduct described in this Complaint.

## Count IV
## (Rehabilitation Act of 1973 - Retaliation)

211.    Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

212.    Defendants' conduct as described in this Complaint constitutes discrimination and retaliation in violation of the Rehabilitation Act of 1973 and its implementing regulations.

213.    Defendants violated the law when it failed to provide reasonable accommodation to Mr. Fenicle, including failure to modify his class schedule.

214.    Defendants permitted non-disabled employees to modify their class schedules despite providing less notice and having no medical reasons.

215.   Defendants violated the law when it denied requests for reasonable accommodation without sufficient cause or basis and failed to engage in the interactive process.

216.   After requesting the reasonable accommodations and participating in the protected activities described in this Complaint, Defendants violated the law when it retaliated against Plaintiff, including but not limited to denial of multiple reasonable accommodations, denial of a merit contribution in August 2014, subjecting him to disparate treatment with regard to class schedules and performance evaluations, denial of reappointment in August 2015, Dr. Emanuel did not recommend him for reappointment based on false and misleading information, he was denied the opportunity to teach classes in the Summer 2016 term, his appeals of the decision to not reappoint him were denied, his complaints of disability discrimination were denied, and he was terminated from his employment.

217.   Defendants violated the law when it denied Mr. Fenicle a merit contribution on August 29, 2014.

218.   Defendants violated the law when it failed to reappoint Mr. Fenicle for his position and circulated false charges of lacking congenial nature with faculty and students.

219.   Defendants violated the law when it denied Mr. Fenicle's appeals of the decision of non-reappointment and his complaints of disability discrimination.

220.   In sum, Mr. Fenicle, a qualified individual, was exposed to disadvantageous terms or conditions of employment to which non-disabled employees are not exposed and was subjected to retaliation thereafter.

221.   Mr. Fenicle has suffered economic and noneconomic damages in the past and continuing through the present. His damages as a result of Defendant's actions are ongoing.

WHEREFORE, Plaintiff demands judgment against Defendant for equitable relief, economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than five hundred thousand dollars ($500,000.00), plus interest, fees, and costs, including reasonable attorneys' fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, and such other and further relief this Honorable Court determines just and equitable, including all available statutory, equitable relief, and injunctive relief. Plaintiff further specifically demands prospective injunctive relief in the form of an order of reinstatement to his position and an order proscribing the unlawful conduct described in this Complaint.

## Count V
### (Title VII of the Civil Rights Act of 1964 – Retaliation)

222.    Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

223.    Defendants' conduct as described in this Complaint constitutes discrimination on the basis of retaliation in violation of Title VII and its implementing regulations.

224.    After requesting the reasonable accommodations and participating in the protected activities described in this Complaint, Defendants violated the law when it retaliated against Plaintiff, including but not limited to denial of multiple reasonable accommodations, denial of a merit contribution in August 2014, subjecting him to disparate treatment with regard to class schedules and performance evaluations, denial of reappointment in August 2015, Dr. Emanuel did not recommend him for reappointment based on false and misleading information, he was denied the opportunity to teach classes in the Summer 2016 term, his appeals of the decision to not reappoint him were denied, his complaints of disability discrimination were denied, and he was terminated from his employment.

225.    Defendants violated the law when it denied Mr. Fenicle a merit contribution on August 29, 2014.

226.    Defendants violated the law when it failed to reappoint Mr. Fenicle for his position and circulated false charges of lacking congenial nature with faculty and students.

227.    Defendants violated the law when it denied Mr. Fenicle's appeals of the decision of non-reappointment and his complaints of disability discrimination.

228.    In sum, Mr. Fenicle, a qualified individual, was exposed to disadvantageous terms or conditions of employment to which non-disabled employees are not exposed and was subjected to retaliation thereafter.

229.    Mr. Fenicle has suffered economic and noneconomic damages in the past and continuing through the present. His damages as a result of Defendant's actions are ongoing.

WHEREFORE, Plaintiff demands judgment against Defendant for equitable relief, economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than five hundred thousand dollars ($500,000.00), plus interest, fees, and costs, including reasonable attorneys' fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, and such other and further relief this Honorable Court determines just and equitable, including all available statutory and equitable relief. Plaintiff further specifically demands prospective injunctive relief in the form of an order of reinstatement to his position and an order proscribing the unlawful conduct described in this Complaint.

## Count VI
### (42 .S.C. § 1983)

230.    Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

231.    Defendants' conduct as described in this Complaint constitutes a deprivation of rights, discrimination and retaliation in violation of Section 1983 and its implementing regulations.

232.    Defendants violated the law when it failed to provide reasonable accommodation to Mr. Fenicle, including failure to modify his class schedule.

233.    Defendants permitted non-disabled employees to modify their class schedules despite providing less notice and having no medical reasons.

234.    Defendants violated the law when it denied requests for reasonable accommodation without sufficient cause or basis and failed to engage in the interactive process.

235.    After requesting the reasonable accommodations and participating in the protected activities described in this Complaint, Defendants violated the law when it retaliated against Plaintiff, including but not limited to denial of multiple reasonable accommodations, denial of a merit contribution in August 2014, subjecting him to disparate treatment with regard to class schedules and performance evaluations, denial of reappointment in August 2015, Dr. Emanuel did not recommend him for reappointment based on false and misleading information, he was denied the opportunity to teach classes in the Summer 2016 term, his appeals of the decision to not reappoint him were denied, his complaints of disability discrimination were denied, and he was terminated from his employment.

236.    Defendants violated the law when it denied Mr. Fenicle a merit contribution on August 29, 2014.

237.    Defendants violated the law when it failed to reappoint Mr. Fenicle for his position and circulated false charges of lacking congenial nature with faculty and students.

238.    Defendants violated the law when it denied Mr. Fenicle's appeals of the decision of non-reappointment and his complaints of disability discrimination.

239.    In sum, Mr. Fenicle, a qualified individual, was exposed to disadvantageous terms or conditions of employment to which non-disabled employees are not exposed and was subjected to retaliation thereafter.

240.    Mr. Fenicle has suffered economic and noneconomic damages in the past and continuing through the present. His damages as a result of Defendant's actions are ongoing.

WHEREFORE, Plaintiff demands judgment against Defendant for equitable relief, economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than five hundred thousand dollars ($500,000.00), plus interest, fees, and costs, including reasonable attorneys' fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, and such other and further relief this Honorable Court determines just and equitable, including all available statutory, equitable relief, and injunctive relief. Plaintiff further specifically demands prospective injunctive relief in the form of an order of reinstatement to his position and an order proscribing the unlawful conduct described in this Complaint.

## Count VII
**(Maryland State Government Article § 20-601 – Disability Discrimination and Retaliation)**

241.    Plaintiff adopts and incorporates by reference all allegations of this Complaint as if fully set forth herein.

242.    The state claims asserted in this Count are so related to the above-stated claims that they form part of the same case or controversy, and arise from the same set or common nucleus of operative facts.

243.     Mr. Fenicle is a qualified individual with a disability. He suffers from a physical or mental impairment that substantially limits him in major life activities, has a record of his impairment and/or was perceived as disabled.

244.     Mr. Fenicle was able to perform the essential functions of his position with or without accommodation.

245.     Between 2013 and 2015, Mr. Fenicle frequently requested reasonable accommodations for his medical impairments.

246.     Defendants' conduct as described in this Complaint constitutes discrimination on the basis of disability and retaliation in violation of the Maryland State Government Article § 20-601, et seq., and its implementing regulations.

247.     Defendants violated the law when it failed to provide reasonable accommodation to Mr. Fenicle, including failure to modify his class schedule.

248.     Defendants permitted non-disabled employees to modify their class schedules despite providing less notice and having no medical reasons for such modifications.

249.     Defendants violated the law when it denied requests for reasonable accommodation without sufficient cause or basis and failed to engage in the interactive process.

250.     After requesting the reasonable accommodations and participating in the protected activities described in this Complaint, Defendants violated the law when it retaliated against Plaintiff, including but not limited to denial of multiple reasonable accommodations, denial of a merit contribution in August 2014, subjecting him to disparate treatment with regard to class schedules and performance evaluations, denial of reappointment in August 2015, Dr. Emanuel did not recommend him for reappointment based on false and misleading information, he was denied the opportunity to teach classes in the Summer 2016 term, his appeals of the

decision to not reappoint him were denied, his complaints of disability discrimination were denied, and he was terminated from his employment.

251.    Defendants violated the law when it denied Mr. Fenicle's appeals of the decision of non-reappointment and his complaints of disability discrimination.

252.    Defendants violated the law when Mr. Fenicle's employment was terminated in June 2016.

253.    In sum, Mr. Fenicle, a qualified individual, was exposed to disadvantageous terms or conditions of employment to which non-disabled employees are not exposed and was subjected to retaliation thereafter.

254.    Mr. Fenicle has suffered economic and noneconomic damages in the past and continuing through the present. His damages as a result of Defendant's actions are ongoing.

WHEREFORE, Plaintiff demands judgment against Defendant for equitable relief, economic and noneconomic damages, including ongoing damages, in an amount to be determined at trial, but no less than five hundred thousand dollars ($500,000.00), plus interest, fees, and costs, including reasonable attorneys' fees, expert witness fees, litigation expenses, and out-of-pocket costs incurred in connection with this action, and such other and further relief this Honorable Court determines just and equitable, including all available statutory and equitable relief. Plaintiff further specifically demands prospective injunctive relief in the form of an order of reinstatement to his position and an order proscribing the unlawful conduct described in this Complaint.

## **JURY DEMAND**

Plaintiff respectfully requests a jury trial in all claims so triable.

_____/s/_ **JASON I. WEISBROT**_____
Jason I. Weisbrot, Esq. (Bar No. 28074)

41

Respectfully submitted,

SNIDER & ASSOCIATES, LLC

_____/s/_ **JASON I. WEISBROT**_____
Jacob Y. Statman, Esq. (Bar No. 16932)
jstatman@sniderlaw.com
Jason I. Weisbrot, Esq. (Bar No. 28074)
jason@sniderlaw.com
Pikesville Plaza Building
600 Reisterstown Road
Seventh Floor
Baltimore, Maryland 21208
410.653.9060 (T)
410.653.9061 (F)

*Counsel for Plaintiff*