IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| RONALD FENICLE, | * | |
| Plaintiff, | * | |
| v. | * | Civil No. ELH-18-0917 |
| TOWSON UNIVERSITY, *et al.,* | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

In this employment discrimination case, plaintiff Ronald Fenicle, a former contract Lecturer at Towson University ("TU"), filed suit against defendants TU and four of its employees, in their individual and official capacities: Lisa Ann Plowfield, Dean of the College of Health Professions; Dr. Diana Emanual, Chair of the Department of Audiology, Speech-Language Pathology and Deaf Studies; Dan Leonard, the former disabilities coordinator of TU; and Dr. Kim Schatzel, the President of TU.[1]  ECF 5 (Amended Complaint).

The Amended Complaint exceeds 40 pages and contains seven counts.  The claims are rooted in plaintiff's contention that he was discriminated against because he is deaf; he was denied reasonable accommodations; and he was retaliated against when he was denied a merit increase in August 2014 and when his academic appointment was not renewed in September 2015 for the following academic year.

---

[1] Fenicle specifies that the individual defendants were sued in their individual capacities only for Count VI.  ECF 5, ¶¶ 4-7.  Count VI will be dismissed, for the reasons discussed below. Therefore, the claims against the defendants in their individual capacities will not stand.

In particular, Fenicle asserts claims for violations of Titles I, II, and V of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12101 *et seq.* ("ADA") (Counts I, II, and III, respectively); violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.* (Count IV); violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") (Count V); violation of 42 U.S.C. § 1983 (Count VI); and violation of the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code (2014 Repl. Vol., 2017 Supp.), §§ 20-601 *et. seq.* of the State Government Article ("S.G.") (Count VII). *Id.* ¶¶ 169-254. He seeks prospective injunctive relief, including reinstatement to his position, along with monetary damages.

Defendants have moved to dismiss most of Fenicle's claims (ECF 8), supported by a memorandum (ECF 8-1) (collectively, the "Motion"). Fenicle opposes the Motion as to Counts I, II, III, and VI. ECF 10 ("Opposition") at 2. He expressly seeks to withdraw his Title VII claim in Count V. *Id.* at 19. Defendants have replied. ECF 11 ("Reply").

No hearing is necessary to resolve the Motion. *See* Loc. R. 105.6 (D. Md. 2016). For the reasons that follow, I will grant the Motion, in part.

## I.    Factual and Procedural Background[2]

Fenicle has been deaf since birth and, for the past 15 years, he has suffered from vertigo and migraine headaches. ECF 5, ¶¶ 12-16. Towson University is a public institution for higher education within the University System of Maryland. *Id.*, ¶¶ 3, 17.

In January 2013, Fenicle was hired by TU as a contract Lecturer for the Spring 2013 term, to teach in the Audiology, Speech-Language Pathology and Deaf Studies Department

---

[2] As discussed, *infra*, given the posture of this case, I must assume the truth of the facts alleged by Fenicle.

("ASLD"). ECF 5, ¶ 21. Fenicle's contract was subject to annual renewal, based upon his teaching performance. *Id.* ¶ 28. In his position as Lecturer, Dr. Emanuel was Fenicle's primary supervisor. *Id.* ¶ 23.

In May 2013, Fenicle raised concerns about the doorbell system on the Deaf Studies floor, which is needed to alert a deaf person to a fire. *Id.* ¶¶ 29, 32. He suggested that it was not in compliance with the ADA. *Id.* ¶ 29. Thereafter, he continued to express dissatisfaction with the doorbell system and other matters. *Id.* ¶¶ 36, 93, 99. In August 2013, Fenicle requested a larger computer monitor, claiming that the smaller screen triggered his migraines and vertigo. *Id.* ¶ 37. Dr. Emanuel denied the request, citing budgetary constraints. *Id.* Once Fenicle made an official request for a reasonable accommodation in the form of a larger computer monitor, the larger monitor was ordered. *Id.* ¶¶ 41, 43.

In Fall 2013, plaintiff's classes were scheduled on Monday, Wednesday, and Friday at 8:00 a.m. *Id.* ¶ 35. Between 2013 and 2015, Fenicle requested later start times for his scheduled classes (*id.* ¶ 44), claiming that "bumper-to-bumper traffic would trigger his vertigo." *Id.* ¶ 46. Dr. Emanuel told him that he could not start to teach after 10:00 a.m. until the Fall 2014 semester. *Id.* ¶ 48. Plaintiff's Spring 2014 classes began at 8:00 a.m., three days per week. *Id.* ¶ 50.

During the Spring 2014 semester, Fenicle received some complaints from students about their assignment deadlines and grades. *Id.* ¶¶ 57, 59, 64. Fenicle's classes in the Summer of 2014 were scheduled for later in the morning, as were his classes in the Fall of 2014. *Id.* ¶¶ 67-68. On August 29, 2014, the ASLD Promotion, Tenure, Reappointment and Merit ("PTRM") committee determined not to award merit pay to plaintiff, although he was reappointed for the 2015-16 academic year. *Id.* ¶¶ 69, 72, 73.

"Dr. Smart" performed a peer evaluation of plaintiff in February 2014. *Id.* ¶ 54. He received a score of 5 out of 5. *Id.* In September 2014, Dr. Emanuel conducted a peer evaluation of Fenicle and rated him as "mediocre." *Id.* ¶ 76. But, a peer evaluation performed by Dr. Sheryl Cooper was excellent. *Id.*

In October 2014, Fenicle sought to move his class start time to 11:00 a.m., to reduce his morning vertigo symptoms, triggered by traffic. *Id.* ¶¶ 46, 78. Dr. Emanuel stated that she would not move the scheduled start time for the Spring 2015 semester, and denied his request to teach two evening classes in lieu of daytime classes. *Id.* ¶¶ 79-80. Fenicle renewed his request for the accommodation of a later start time in December 2014, and Dr. Emanuel denied it again, stating that it was too late to modify the Spring 2015 schedule. *Id.* ¶¶ 88-89.

In December 2014, plaintiff received his course evaluations for the Fall 2014 term. He received excellent scores for all five of his classes. *Id.* ¶ 87.

Fenicle's classes in the Summer of 2015 began at 9:30 a.m. *Id.* ¶ 104. Beginning in October 2015, Fenicle had several meetings with Dan Leonard, then serving as the ADA Coordinator at TU *Id.* ¶ 136. Leonard told Fenicle to complete a Faculty and Staff Accommodation Request form for his request to start his classes at a later time. *Id.* ¶ 138. Dr. Emanuel agreed to alter Fenicle's schedule to begin classes at 11 a.m. or later, beginning in Fall 2015. *Id.* ¶ 141. In view of the schedule change, plaintiff "did not experience any instances of tardiness for Fall 2015 or Spring 2016 . . . ." *Id.*

On August 25, 2015, the PTRM committee decided not to renew Fenicle's appointment for the 2016-17 academic year. *Id.* ¶ 113. On August 27, 2015, Dr. Emanuel sent a letter to Dean Plowfield, recommending against Fenicle's reappointment as a Lecturer for the 2016-17 school year. *Id.* ¶ 116. On September 28, 2015, Fenicle received notice of his non-reappointment for

the 2016-17 school year. ECF ¶¶ 119-20. Dr. Emanuel informed Fenicle that she would not reconsider her decision. *Id.* ¶ 122.

Fenicle sent Dean Plowfield a "Letter of Appeal" on October 18, 2015, regarding his non-reappointment. *Id.* ¶ 129. Moreover, plaintiff's colleagues wrote a letter in support of him. *Id.* ¶¶ 130, 131. Nevertheless, Plowfield wrote to Fenicle on October 21, 2015, informing him that Lecturers do not have the right to appeal the PTRM's decision. *Id.* ¶ 134.

Plaintiff received formal notification of his non-renewal by letter of December 7, 2015. *Id.* ¶ 145. That month, he also received excellent course evaluations for the Fall 2015 semester. *Id.* ¶ 148. However, no peer evaluation was conducted, because his contract was not renewed. *Id.* ¶ 149.

Leonard issued a letter to plaintiff on February 8, 2016, stating that he had found no factual basis to support Fenicle's allegations of disability discrimination. *Id.* ¶ 153. Fenicle appealed Leonard's determination. *Id.* ¶ 155.

On April 11, 2016, Dr. Emanuel received a Petition started by TU students, with 728 signatures, "highlighting the positive impact" of plaintiff. *Id.* ¶ 157. Plaintiff also received excellent course evaluations in May 2016 for the Spring 2016 semester. *Id.* ¶ 160.

As a result of plaintiff's non-reappointment, his employment ended in June 2016, at the conclusion of the Spring 2016 term. He filed a complaint of discrimination with the EEOC that month. *Id.* ¶¶ 163-64.

On July 14, 2016, Schatzel, the President of TU, denied Fenicle's appeal and affirmed Leonard's decision. *Id.* ¶ 165. On January 2, 2018, the EEOC issued Fenicle a notice of right to sue. *Id.* ¶ 10. This suit followed on March 30, 2018. ECF 1.

## II.     Legal Standards

### A.

As noted, defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, asserting that plaintiff's claims are barred by sovereign immunity.

Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also The Piney Run Pres. Ass'n v. The Cty. Comm'rs Of Carroll Cty., MD*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). A Rule 12(b)(1) motion should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Clarke* v. *DynCorp Intern. LLC*, 962 F. Supp. 2d 781, 786 (D. Md. 2013) (quotation marks and citation omitted).

The Fourth Circuit recently reiterated that the defense of sovereign immunity is a jurisdictional bar, stating that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (quoting *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009)). The defendant "bears the burden of demonstrating" sovereign immunity, because it is "akin to an affirmative defense." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "that the

jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted) (alteration in original); *see Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013). A factual challenge can assert that facts outside the four corners of the complaint preclude the exercise of subject matter jurisdiction. *Id.*

In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192. In a factual challenge, on the other hand, "the district court is entitled to decide disputed issues of fact with respect to subject matter jurisdiction." *Id.* In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't Of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347-48 (4th Cir. 2009) ("Unless 'the jurisdictional facts are intertwined with the facts central to the merits of the dispute,' the district court may ... resolve the jurisdictional facts in dispute by considering evidence ... such as affidavits.") (citation omitted); *Evans,* 166 F.3d at 647.

With respect to the contention that Fenicle's claims are barred by Eleventh Amendment immunity, defendants seem to raise a facial challenge. Therefore, I shall assume the truth of Fenicle's allegations.

It is not clear whether a motion to dismiss based on the Eleventh Amendment is properly considered pursuant to Rule 12(b)(1) or Rule 12(b)(6). *See Strong v. Swaim-Stanley*, WMN-12-cv-1924, 2012 WL 4058054 (D. Md. Sept. 13, 2012). Judge Titus addressed this uncertainty in *Beckham v. National R.R. Passenger Corp.*, 569 F.Supp. 2d 542 (D. Md. 2008). He said, *id.* at 547 (internal citations omitted, alteration added):

[T]he Eleventh Amendment limits the ability of a federal district court to exercise its subject-matter jurisdiction over an action brought against a state or one of its entities. As such, although Eleventh Amendment immunity is not a "true limit" on this Court's subject matter jurisdiction, the Court concludes that it is more appropriate to consider this argument under Fed. R. Civ. P. 12(b)(1) because it ultimately challenges this Court's ability to exercise its Article III power.

Judge Titus's reasoning is persuasive. Therefore, I shall consider the Eleventh Amendment challenge under Rule 12(b)(1). *See also Abril v. Com. of Virginia*, 145 F.3d 182, 184 (4th Cir. 1998) (affirming the district court's dismissal of a claim barred by sovereign immunity under Rule 12(b)(1)).

## B.

Under Rule 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221, 133 S.Ct. 1709, 185 L.Ed.2d 758 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' ...."); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1964. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, —— U.S. ——, 135 S.Ct. 346, 346, 190 L.Ed.2d 309 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1964; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1964. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if ... [the] actual proof of those facts is improbable and ... recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. Maryland Transit Admin.*, 845 F.3d

564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts generally do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards,* 178 F.3d at 243 (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies ... if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*' " *Goodman,* 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman*).

### III.     ADA claims (Counts I, II, III)

The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id.* § 12101(b)(2). The ADA contains five titles: Title I, Employment; Title II, Public Services; Title III, Public Accommodations; Title IV, Telecommunications; and Title V, Miscellaneous Provisions.

Plaintiff asserts that defendants' actions violated Title I, Title II, and Title V of the ADA. According to plaintiff, his complaints of discrimination constituted protected activity. ECF 10 at 11. In plaintiff's view, a Title V ADA claim is not "solely dependent" on the claims in Title I and II, and he maintains that, under Title V, he is entitled to pursue both monetary damages and prospective relief. *Id.*

Title I of the ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 328 (4th Cir. 2014) ("The ADA makes it unlawful for covered employers to 'discriminate against a qualified individual on the basis of disability.'") A "qualified individual" is defined as a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Unlawful discrimination under Title I of the ADA "can include the failure to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . .'" *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013) (quoting § 12112(b)(5)(A)). Moreover, "denying

employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability" may qualify as "discrimination against a qualified individual on the basis of disability." 42 U.S.C. § 12112(b)(5)(B). In addition, the ADA bars the discharge of a qualified employee because he is disabled. *Summers*, 740 F.3d at 328.

Title II of the ADA prohibits public entities, including "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government," *id.* § 12131(1), from discriminating "by reason of" disability against a "qualified individual with a disability." *Id.* § 12132. For purposes of Title II, a "qualified individual with a disability" is defined as an individual with a disability "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). Title II of the ADA applies to "'anything a public entity does.'" *Seremeth v. Bd. of County Comm'rs of Frederick County*, 673 F.3d 333, 338 (4th Cir. 2012) (citing cases) (citations omitted); *see also Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 380-81 (D. Md. 2011) (collecting authority).

It is well established that private parties may sue to enforce Title II of the ADA. *Barnes v. Gorman*, 536 U.S. 181, 184-85 (2002); *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 828 (4th Cir. 1994); *Davis v. Southeastern Community Coll.*, 574 F.2d 1158, 1159 (4th Cir. 1978), *rev'd on other grounds*, 442 U.S. 397 (1979). *Cf. Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582 (1983) (establishing that Title VI of the Civil Rights Act of 1964 supports a private right of action). To prevail under an ADA Title II claim, "a plaintiff must show that [he or] she was excluded from participation in, or denied the benefits of, a program or service offered by a

public entity, or subjected to discrimination by that entity." *Constantine*, 411 F.3d at 499 (emphasis omitted). To that end, the Fourth Circuit has recognized "three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *Helping Hand*, 515 F.3d at 362.

The term "reasonable accommodations," which is derived from the employment discrimination provisions of Title I of the ADA, is essentially synonymous with the term "reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services," 42 U.S.C. § 12131(2), which is what Title II of the ADA requires a public entity to provide. *See, e.g.*, *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1195 n.8 (10th Cir. 2007) ("Title II's use of the term 'reasonable modifications' is essentially equivalent to Title I's use of the term 'reasonable accommodation.'"); *McGary v. City of Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004) ("Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards.").

Title V includes provisions against retaliation. *See* 42 U.S.C. 12203(a). The ADA states: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

"Modeled after Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* the ADA incorporates that statute's enforcement procedures, *id.* § 12117(a), including the requirement that a plaintiff must exhaust [her] administrative remedies by filing a charge with the EEOC before pursuing a suit in federal court, *see id.* § 2000e–5(b), (f)(1)." *Sydnor v. Fairfax*

*Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012). The administrative claims process is "'an integral part'" of the enforcement scheme that Congress set out in Title VII. *Id.* (quoting *Chacko v. Patuxent Inst.,* 429 F.3d 505, 510 (4th Cir. 2005)). By incorporation, it is also integral to the ADA. *See Sydnor*, 681 F.3d at 593. "Allowing [the EEOC] first crack at these cases respects Congress's intent 'to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less expensive resolution of disputes.'" *Id.* (quoting *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000)).

Notably, the ADA does not provide for private actions against individual defendants who are not employers. *See Jones v. Sternheimer*, 387 F. App'x 366, 368 (4th Cir. 2010) (per curiam) ("[T]he ADA . . . do[es] not provide for causes of action against defendants in their individual capacities."); *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 472 (4th Cir. 1999) (noting that "Title VII does not provide a remedy against individual defendants who do not qualify as 'employers'" and extending that holding to the ADA). Therefore, claims against the defendants in their individual capacities are subject to dismissal.

To establish a prima facie case of wrongful discharge under the ADA, a plaintiff must show that (1) he is within the ADA's protected class; (2) he was subject to an adverse employment action; (3) at the time of the adverse employment action, he was performing the job at a level that met the legitimate expectations of his employer; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination. *See Wilson*, 717 F.3d at 346-47; *Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 947 (4th Cir. 2013) (per curiam); *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001); *see also Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th Cir. 1997); *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264-65 (4th Cir. 1995). "An adverse employment action is a

discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland,* 487 F.3d at 219. Typically, an adverse employment action has been found in cases of "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin,* 178 F.3d 253, 255 (4th Cir. 1999); *see Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510, 513 (4th Cir. 2006).

To establish a prima facie case of retaliation, a plaintiff "must show (1) that he engaged in protected activity; (2) that his employer took an adverse action against him; and (3) that a causal connection existed between the adverse activity and the protected action." *Haulbrook*, 252 F.3d at 706; *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 578 (4th Cir. 2015) (same). The Fourth Circuit recently clarified in *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 327 n.3 (4th Cir. 2018), a Title VII case, that an "adverse *employment* action" is not the standard in a retaliation case. (Emphasis added). The adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." *Id.* Notably, requesting a workplace accommodation based on one's disability is a protected activity under the ADA. *See Haulbrook*, 252 F.3d at 706; *see Sillah v. Burwell*, 244 F. Supp. 3d 499, 513 (D. Md. 2017).

As noted, Fenicle has asserted claims under Titles I, II, and V of the ADA. Fenicle's claims under Title II of the ADA (Count II) are not viable. Fenicle concedes that, in *Reyazuddin v. Montgomery Cnty., Maryland*, 789 F.3d 407 (4th Cir. 2015), the Fourth Circuit stated: "Based on the text and structure of Title II and the ADA, we agree with the majority of circuits to have considered the question that Title II unambiguously does not provide a vehicle for public employment discrimination claims." *Id.* at 421; *see* ECF 10 at 14. The Fourth Circuit acknowledged in *Reyazuddin* that the Eleventh Circuit had reached a different result in *Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist.*, 133 F.3d 816 (11th Cir. 1998), but found

that the *Bledsoe* decision had rested upon "a cursory recitation of part of Title II's text, no analysis of the ADA's structure, and heavy reliance on legislative history and the Attorney General's regulations." *Reyazuddin*, 789 F.3d at 421.

Fenicle argues that "the Fourth Circuit's position in this regard should be reversed" and that I "should adopt the reasoning as espoused in the Eleventh Circuit's holding" in *Bledsoe*. ECF 10 at 14. However, I may not reject binding Fourth Circuit precedent. Therefore, I need not address this position on its merits. I shall dismiss Count II of Fenicle's Amended Complaint, because his Title II ADA claim for public employment discrimination cannot stand.

With respect to Fenicle's Title I and Title V ADA claims, defendants assert that the claims against TU and Leonard are barred by the Eleventh Amendment. Further, they assert that the claims against the remaining individual defendants may proceed only in their official capacities, and only to the extent that the claims seek prospective injunctive relief, such as reinstatement. ECF 8-1 at 5-10. The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." The Eleventh Amendment "embodies the principle of sovereign immunity and prohibits suit by private parties against states in federal courts." *Weller v. Dep't of Soc. Serv's for City of Balt.*, 901 F.2d 387, 397 (4th Cir. 1990).

The preeminent purpose of state sovereign immunity is "to accord states the dignity that is consistent with their status as sovereign entities . . . ." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002); *see Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (quoting *In re Ayers*, 123 U.S. 443, 505 (1887)). Thus, states enjoy immunity from suits brought in federal court by their own citizens, even though the text of

the Eleventh Amendment does not explicitly address such a scenario. *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890); *see also Bd. of Tr.'s of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court.").

The Eleventh Amendment to the United States Constitution, which preserves the sovereign immunity of the states, precludes a private individual from suing an unconsenting state or its agencies for monetary damages in federal court, absent waiver or a valid Congressional abrogation of sovereign immunity. *See Coleman v. Court of Appeals of Md.*, 566 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011); *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 56-58 (1996).

And, of import here, Eleventh Amendment sovereign immunity also bars suit against an instrumentality of a state, sometimes referred to as an "arm of the state," absent waiver or a valid congressional abrogation of sovereign immunity. In *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984), the Supreme Court said: "It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *See also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005).

In this case, TU is a constituent institution of the University System of Maryland, and therefore it is an instrumentality of the State for purposes of sovereign immunity. *See* Md. Code

(2018 Repl. Vol., 2018 Supp.), § 12-102(a)(2), (3) of the Education Article ("Educ.") (providing that the University System of Maryland is "an instrumentality of the State" and "an independent unit of State government"); Educ. § 12-101(b)(6)(ix) (listing TU among the "Constituent institutions" of the University System of Maryland); *see also Palotai v. Univ. of Md., College Park*, 959 F. Supp. 714, 716 (D. Md. 1997) (concluding that the University of Maryland is an "arm of the State," subject to Eleventh Amendment immunity). Likewise, the individual defendants, as state officers sued for damages in their official capacities, are also entitled to Eleventh Amendment immunity. *See Cory v. White*, 457 U.S. 85, 90 (1982); *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).

There are, however, three exceptions to the Eleventh Amendment's prohibition of a suit against a state or an arm of the state. In *Lee-Thomas v. Prince George's Cnty. Pub. Sch.*, 666 F.3d 244 (4th Cir. 2012), the Court said, *id.* at 249 (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett,* 531 U.S. 356, 363 (2001) . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins,* 540 U.S. 431, 437 (2004) . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.,* 535 U.S. 613, 618 (2002).

The first and third exceptions do not apply here. Title I of the ADA originally contained language abrogating state sovereign immunity in federal court. However, the Supreme Court determined in *Bd. Of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356 (2001), that Congress did not validly abrogate sovereign immunity with respect to discrimination claims under Title I of the ADA. *Id.* at 374. The Court said, *id.*: "[T]o authorize private individuals to recover money damages against the States, there must be a pattern of discrimination by the States which violates

18

the Fourteenth Amendment . . . Those requirements are not met here . . .”; *see also McCray v. Maryland Dep't of Transp., Maryland Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014).

As to the third exception, there is no allegation of a waiver of immunity by the State. To be sure, a state may waive its Eleventh Amendment sovereign immunity and permit suit in federal court. *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002); *Lee-Thomas*, 666 F.3d at 249. But, the test to determine whether a State has waived its immunity from suit in federal court is a “stringent” one. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 240 (1985), *superseded on other grounds, as recognized in Lane v. Pena*, 518 U.S. 187, 198 (1996). Under *Atascadero*, a court may find that a state has waived its Eleventh Amendment immunity “only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction.” *Id.* (internal quotation marks and alteration omitted); *accord Lee-Thomas*, 666 F.3d at 250-51.

Maryland has not waived its sovereign immunity as to suit in federal court. *See McCray*, 741 F.3d at 483; *see also Constantine*, 411 F.3d at 479. Indeed, Fenicle seems to recognize that his claim for monetary relief under Title I of the ADA is precluded by the Eleventh Amendment. ECF 10 at 9.

Both parties agree, however, that under the second exception, best known as the exception of *Ex Parte Young*, 209 U.S. 123 (1908), Fenicle is permitted to seek prospective injunctive relief or reinstatement from a State official sued in his or her official capacity. *Raiford v. Md. Dep't of Juvenile Servs.*, Civil No. DKC-12-3795, 2014 WL 4269076, *5 (D. Md. Aug 28, 2014) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 n. 10 (1989)) (stating that where “a state official in his or her official capacity [is] sued for injunctive relief ... ‘official-

capacity actions for prospective relief are not treated as actions against the State.'") (quoting *Ex parte Young*, 209 U.S. 123, 159–60 (1908)).

Thus, Fenicle's claims seeking reinstatement under Title I and Title V of the ADA can proceed against three individual defendants: Dean Plowfield, Dr. Emanuel, and President Schatzel. They remain employed at TU and have been sued in their official capacities. Because Leonard is no longer employed by TU, however, he cannot be sued for prospective injunctive relief. *See* ECF 5, ¶ 6 ("Dan Leonard is the former Fair Practices Officer/Title IX Coordinator/ADA Coordinator at Towson University."); *see also Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 245 (E.D.N.Y. 2015) (noting that former employees lack the capacity to grant reinstatement).

Fenicle contends that, although he cannot seek monetary relief under Title I, he should be permitted to seek monetary relief against the defendants as to his Title V retaliation claim. ECF 10 at 10-11. I considered and rejected Fenicle's position in an unrelated case. In *Cook v. Springfield Hospital Center,* Civil No. ELH-16-2024, 2016 WL 6124676, at *7 (D. Md. October 19, 2016), I reasoned (footnote omitted):

> Neither the Supreme Court nor the Fourth Circuit has determined whether Congress abrogated sovereign immunity for retaliation claims under Title V. "[M]any courts have distinguished between retaliation claims that stem from Title I employment discrimination and Title II discrimination in the provision of public services." *Levy v. Kan. Dept. of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1169 (10th Cir. 2015) (collecting cases). This is because "[a] Title V retaliation action must rest upon a previous Title's subject." *Melerski v. Virginia Dep't of Behavioral Health & Developmental Servs.*, No. 4:15-CV-00039, 2016 WL 154144, at *3 (W.D. Va. Jan. 11, 2016) (citing *Collazo-Rosado v. Univ. of P.R.*, 775 F. Supp. 2d 376, 384 (D. P.R. 2011)). In other words, Title V must be predicated on another part of the ADA because "Title V prohibits discrimination against an employee who opposes an 'act or practice made unlawful' by the substantive provisions of the ADA." *Demshki v. Monteith*, 255 F.3d 986, 988-89 (9th Cir. 2001). Thus, where Title V claims are predicated on Title I claims, "Congress may not abrogate the states' Eleventh Amendment immunity from Title V claims." *Id.* at 989.

Accordingly, I concluded that because Cook's Title V claim was predicated on her Title I claim, the Supreme Court's determination that sovereign immunity barred her Title I claim also barred her Title V claim. *Id.* at *8. The same analysis is applicable here. Although Fenicle expresses disagreement with my ruling in *Cook*, he cites no precedent interpreting the ADA to reach a contrary conclusion. *See* ECF 10 at 10.

Finally, with respect to Fenicle's ADA claims against the remaining individual defendants for prospective injunctive relief and reinstatement, Fenicle may only maintain claims for discriminatory actions taken after September 4, 2015.

An employee is typically required to file a charge with the EEOC within 180 days of an alleged discriminatory act. *See* 42 U.S.C. § 2000e-5(e)(1); *Edelman v. Lynchburg College*, 300 F.3d 400, 404 n.3 (4th Cir. 2002). In a deferral jurisdiction, such as Maryland, the period is 300 days. *Id.* Fenicle filed his first charge with the EEOC on June 30, 2016. ECF 5 ¶ 164. Accordingly, claims regarding any act occurring more than 300 days earlier, *i.e.*, before September 4, 2015, are time-barred.

As Fenicle notes, binding precedent precludes "a continuing violation theory for the Defendant's failure to provide reasonable accommodations," ECF 10 at 12 (citing *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 104 (2002); *see Szedlock v. Tenet*, 61 F.App'x 88, 93 (4th Cir. 2003). The case law cited by Fenicle pertains only to hostile work environment claims, for which continuing violation theories are viable. *See* ECF 10 at 12-13. However, no hostile work environment is alleged in this case.

## IV. Title VII Claim (Count V)

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, "prohibits employers from discriminating on the basis of race, color, religion, sex, or national origin, or retaliating against their employees for opposing or seeking relief from such

discrimination." *Green v. Brennan*, ___ U.S. ___, 136 S.Ct. 1769, 1773-74 (2016); *see Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 233 (4th Cir. 2016); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

Fenicle's Amended Complaint alleged disability discrimination in violation of Title VII. *See* ECF 5, Count V. However, defendants appropriately noted that Title VII does not prohibit discrimination or retaliation based on disability. ECF 8 at 9-10. Thereafter, Fenicle withdrew his Title VII claim. ECF 10 at 19. Accordingly, Count V will be dismissed.

## V.     Rehabilitation Act and MFEPA (Counts IV, VII)

Fenicle has also asserted claims under the Rehabilitation Act and the MFEPA. *See* Counts IV, VII.

The Rehabilitation Act was enacted seventeen years prior to the ADA. Title II of the ADA is closely related to § 504 of the Rehabilitation Act and, to "the extent possible, [courts] construe similar provisions in the two statutes consistently." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 214 (4th Cir. 2002). *See Seremeth*, 673 F.3d at 336 n.1 ("Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is 'substantially the same.'") (citation omitted); *Rogers v. Dept. of Health & Environmental Control*, 174 F.3d 431, 433-34 (4th Cir. 1999) (stating that courts may apply Rehabilitation Act precedent in interpreting the ADA, and vice versa). Indeed, the statutes "share the same definitions of disability," *id.* at 433, and Title II of the ADA explicitly provides that "[t]he remedies, procedures, and rights" provided under § 504 of the Rehabilitation Act "shall be the remedies, procedures, and rights [that Title II of the ADA] provides to any person

alleging discrimination on the basis of disability. . . ."  42 U.S.C. § 12133.[3]

Despite the general congruence of Title II of the ADA and § 504 of the Rehabilitation Act, there are two principal differences between the statutes.  First, a plaintiff must show a different "causative link between discrimination and adverse action" under the two statutes.  *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 469 (4th Cir. 1999).  Under Title II, a plaintiff need only prove discrimination "by reason of" disability.  42 U.S.C. § 12132.  But, a successful Rehabilitation Act claim requires a showing of discrimination "*solely* by reason of" disability.  29 U.S.C. § 794(a) (emphasis added).  *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 n.17 (4th Cir. 2005) ("[W]e have recognized that the causation standards under Title II of the ADA and § 504 of the Rehabilitation Act are 'significantly dissimilar.'") (quoting *Baird*, 192 F.3d at 469).

The second significant difference between Title II and the Rehabilitation Act is that, as noted, Title II applies to any "public entity," while § 504 of the Rehabilitation Act applies only to federal agencies or to "any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  Thus, to show a violation of the Rehabilitation Act by a state, local, or private entity, a plaintiff must demonstrate that the "program or activity" at issue receives "Federal financial assistance."

---

[3] In turn, the Rehabilitation Act incorporates by reference the "remedies, procedures, and rights" established by Title VI of the Civil Rights Act of 1964 (codified at 42 U.S.C. § 2000d *et seq.*), which prohibits discrimination on the basis of race, color, or national origin by recipients of federal financial assistance.  29 U.S.C. § 794a(a)(2).  Accordingly, courts look to Title VI precedent to resolve remedial and procedural issues arising in Rehabilitation Act and ADA Title II cases.  In general, a successful plaintiff in a suit under Title II of the ADA or § 504 of the Rehabilitation Act is entitled to a "full panoply" of legal and equitable remedies, including money damages and injunctive relief.  *Pandazides*, 13 F.3d at 830; *see generally id.* at 829-32.  However, there are some limitations as to available relief.  Punitive damages are not available.  *See Barnes*, 536 U.S. at 189.  Moreover, compensatory damages are available only upon proof of disparate treatment, rather than mere disparate impact.  *Pandazides*, 13 F.3d at 829-30 & n.9.

The claims here are subject to a two-year limitations period. *See* Md. Code, State Gov't § 20-1013(a)(3) ("[A] complainant may bring a civil action against [] respondent alleging an unlawful employment practice if the civil action is filed within 2 years after the alleged unlawful employment practice . . ."); *Bowen v. Maryland Dept. of Public Safety and Correctional Services*, Civ. No. RDB-17-1571, 2018 WL 1784463, *6 (D. Md. Apr. 12, 2018) ("The Maryland Fair Employment Practices Act ('MFEPA'), Md. Code, State Gov't § 20-1013 is the state-law analogue to the Rehabilitation Act, and includes a two-year statute of limitations period."); *Magness v. Harford County*, Civ. No. ELH-16-2970, 2018 WL 1505792, at *16 (D. Md. Mar. 27, 2018) ("I conclude that the applicable statute of limitations period for plaintiff's Rehabilitation Act claim is the analogous two-year period found in S.G. § 20-1013(a)(3).").

Fenicle concedes that the applicable statute of limitations for both counts is two years. ECF 10 at 23. Most of the discriminatory actions alleged by Fenicle, including the denial of a merit increase in August 2014 (ECF 5 ¶ 72) and the non-renewal of his contract in September 2015 (ECF 5, ¶ 119), occurred more than two years before Fenicle filed his suit on March 30, 2018. ECF 1.

Fenicle includes allegations regarding a few incidents after March 30, 2016: on April 18, 2016, faculty from the ASLD discussed their concerns with Leonard, including Fenicle's non-reappointment, ECF 5, ¶ 158; on May 4, 2016, Phillip Ross, Associate Vice President for Human Resources, emailed Fenicle about an independent review of his appeal, ECF 5, ¶ 159; and on July 14, 2016, President Schatzel denied Fenicle's appeal, affirmed Leonard's decision, and confirmed that Ross had found no discrimination, ECF 5, ¶ 165. These actions do not constitute additional unlawful employment practices, however.

The discussions and emails had no adverse consequence to Fenicle, and the denial of his appeal of the September 2015 non-renewal is not a separate, new act of discrimination. *See, e.g., Martin v. Southwestern Va. Gas Co.*, 135 F.3d 307, 310 (4th Cir. 1998) (holding that after an employee was informed he would be discharged, a subsequent refusal to consider that employee's request for reasonable accommodations did not constitute a new act of discrimination starting the limitations clock running anew); *Mezu v. Morgan State Univ.,* 367 F. App'x 385, 388-89 (4th Cir. 2010) ("[T]he Provost and Vice President Academic's reaffirmation of her prior adverse recommendation [concerning a promotion] to the President, as well as Defendants' alleged failure to complete the internal appeal process, did not constitute independently discriminatory acts commencing the limitation period anew.").

Because Fenicle has not alleged any acts of discrimination occurring within the applicable two-year limitations period after March 30, 2016, his claims under the Rehabilitation Act (Count IV) and the MDFEPA (Count VII) must be dismissed.

## VI.     42 U.S.C. § 1983 (Count VI)

Finally, in Count VI, Fenicle has asserted claims pursuant to 42 U.S.C. § 1983. ECF 5, ¶¶ 230-40. Section 1983 "creates a private right of action to vindicate violations of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Rehberg v. Paulk*, 566 U.S. 356, 361 (2012). To my knowledge, the Fourth Circuit has not addressed the issue directly. But, each of the federal appellate courts to have considered the question has decided that claims under § 1983 are preempted by the ADA and Rehabilitation Act. *See, e.g.*, *Tri-Corp Housing Inc. v. Bauman*, 826 F.3d 446, 449 (7th Cir. 2016); *M.M.R.-Z. v. Puerto Rico*, 528 F.3d 9, 13 n.3 (1st Cir. 2008); *A.W. v. Jersey City Public Schools*, 486 F.3d 791, 804-06 (3d Cir. 2007); *Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002); *Lollar v. Baker*, 196 F.3d

603, 610 (5th Cir. 1999); *Davis v. Francis Howell School Dist.*, 138 F.3d 754, 757 (8th Cir. 1998); *Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1531 (11th Cir. 1997). Courts within this district have held likewise. *See Traversa v. Ford*, 718 F. Supp. 2d 639, 644 n.3 (D. Md. 2010) (disallowing plaintiff's § 1983 claim for ADA violations); *Lewis v. Bd. of Ed. of Kent County*, Civ. No. JFM-07-955, 2007 WL 2343659, at *1 (D. Md. Aug. 14, 2007) (barring plaintiff from asserting § 1983 claims based on violations of the Rehabilitation Act and the ADA). In fact, Fenicle concedes that rights created by the ADA cannot be vindicated by resort to a claim under 42 U.S.C. § 1983. ECF 10 at 20 (citing *Henderson v. Gilbert*, JFM-06-1284, 2006 WL 1966797, at *1 (D. Md. July 10, 2006); *Walker v. City of Salisbury*, 170 F. Supp. 2d 541, 549 (D. Md. 2001)).

Fenicle argues instead that his § 1983 claim is based upon alleged violations of his constitutional rights under the First and Fourteenth Amendments to the United States Constitution, and therefore is not preempted. *See* ECF 10 at 20 (citing *Pathways Psychosocial v. Town of Leonardtown, Maryland*, 223 F. Supp. 2d 699, 708 (D. Md. 2002) ("Based on the express language of the [ADA] and the subsequent interpretations thereof, Congress did not intend for the ADA to foreclose private claims alleging constitutional violations brought under 42 U.S.C. § 1983.") (quoting *Baumgardner v. County of Cook*, 108 F.Supp.2d 1041, 1043 (N.D. Ill. 2000)). Although the law supports Fenicle's contention that a § 1983 claim asserting violations of constitutional rights would not be preempted, his Amended Complaint makes no reference to constitutional violations.

For example, Count VI does not mention the First Amendment, the Fourteenth Amendment, due process, or free speech. ECF 5 ¶¶ 230-240. Instead, Count VI clearly alleges disability discrimination and retaliation, both of which are part of the comprehensive remedial

scheme in the ADA and the Rehabilitation Act. *See, e.g.*, ECF 5, ¶ 232 ("Defendants violated the law when it [sic] failed to provide reasonable accommodation to Mr. Fenicle"); ¶ 239 ("In sum, Mr. Fenicle, a qualified individual, was exposed to disadvantageous terms or conditions of employment to which non-disabled employees are not exposed."). Count VI, as alleged, is therefore dismissed, without prejudice.

## VII.    Conclusion

For the reasons set forth above, defendants' Motion is granted, in part. Counts II, IV, V, VI, and VII will be dismissed. In addition, Counts I and III will be dismissed as to all claims for monetary relief, all claims against defendants TU and Leonard, and all claims pertaining to acts occurring prior to September 4, 2015. Counts I and III will proceed as to Fenicle's claim for prospective injunctive relief, or reinstatement, against defendants Plowfield, Emanuel, and Schatzel in their official capacities.

An Order follows.


Dated:   November 8, 2018                          _____/s/_____
                                                   Ellen L. Hollander
                                                   United States District Judge